## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **PATRICIA K. PRUET,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CAUSE NO. 1:12-cv-635-WTL-DML** |
| | ) | |
| **FAYETTE REGIONAL HEALTH SYSTEM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ENTRY ON MOTION FOR SUMMARY JUDGMENT AND RELATED MOTIONS

This cause is before the Court on the Defendant's motion for summary judgment and two related motions. The motions are fully briefed and the Court, being duly advised, **GRANTS** the Defendant's motion for summary judgment (Dkt. No. 29) for the reasons set forth below. The Plaintiff's motion for oral argument (Dkt. No. 40) is **DENIED**, inasmuch as the Court's ruling does not require an in-depth understanding of the Defendant's computer system. The Defendant's motion for leave to file a sur-surreply brief (Dkt. No. 45) is **GRANTED**; the Clerk shall docket the Defendant's sur-surreply brief (Dkt. No. 45-1) as of the date of this Entry. Finally, the Court acknowledges and has considered the supplemental authority submitted by the Plaintiff.

### I.  STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476

F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.*  Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II.  PRELIMINARY EVIDENTIARY MATTERS

The Plaintiff argues that the Defendant should be precluded from making certain factual assertions and relying upon several documents because the Defendant failed to produce various documents during discovery.  First, the Plaintiff argues that some of the Defendant's factual assertions are foreclosed because it failed to produce records relating to other employees that were requested by the Plaintiff, including their disciplinary records, time sheets, and work schedules (hereinafter referred to as "the co-worker documents"), and the Plaintiff is unable to refute the factual assertions without those records.  The Defendant did, in fact, object to the Plaintiff's request for the co-worker documents.  In response to the objections, Plaintiff's counsel sent a letter to defense counsel explaining why she believed the objections to be improper.  Defense counsel responded by offering to produce a subset of the documents relating to two of the other employees.  It was there that the Plaintiff's efforts to obtain the co-worker documents stopped.  Plaintiff's counsel could have accepted the Defendant's offer of compromise and obtained the documents regarding two of the employees, or the Plaintiff could have sought the assistance of the Court—either informally by contacting the Magistrate Judge assigned to the

case or formally by filing a motion to compel—in order to obtain all of the co-worker documents (assuming, of course, that all of them were relevant). The Plaintiff also could have utilized Federal Rule of Civil Procedure 56(d) if she believed she needed the documents to respond to the motion for summary judgment and had a good reason for not obtaining the documents sooner. What the Plaintiff could not do was choose to do nothing and then hope to hold the Defendant accountable for its position in a discovery dispute in the context of a summary judgment motion. *Cf. Malik v. Falcon Holdings, LLC,* 675 F.3d 646, 649-50 (7th Cir. 2012) ("[I]f defendants thought that plaintiffs had failed to perform their obligations under the rules, they should have asked the district judge for a sanction before discovery closed rather that waiting (as they did) until their motion for summary judgment."); *Botvinick v. Rush Univ. Med. Center*, 574 F.3d 414, 418 (7th Cir. 2009) (failure to file a motion to compel answer to deposition question "probably forfeited" argument that answer would not have been privileged); *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1149 (7th Cir.1989) (concluding that the defendant forfeited its argument against the introduction of summaries of expense records by failing to move to compel discovery of the records) (cited in *Botvinick*).

The Plaintiff argues that it was not required to pursue the co-worker documents further because the Defendant had an "affirmative obligation to disclose evidence relevant to the claims and defenses in the case." Plaintiff's Surreply at 10. The Defendant had no such duty, however. The Defendant had a duty to respond to the Plaintiff's discovery requests, which it did. To the extent that the Defendant's objections to those discovery requests were unreasonable, the Court would have ordered Defendant to produce additional documents and imposed sanctions for its unreasonable behavior, had the matter been brought to the Court's attention in a timely manner. It was not. The "affirmative obligation" to disclose evidence imposed by the Federal Rules of

Civil Procedure is found in Rule 26(a), which requires, *inter alia*, a party to produce, without being asked, "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and *may use to support its claims or defenses*, unless the use would be solely for impeachment."  Rule 26(a)(1)(A)(ii) (emphasis added).  The Defendant is not attempting to use the co-worker documents to support its defense, however; it is the Plaintiff who wants the documents to rebut the Defendant's defense.  It was therefore the Plaintiff's obligation to use the discovery tools available to it—including seeking the assistance of the Court—to obtain the co-worker documents.

The Plaintiff also points to several documents that the Defendant submits as evidence in support of its motion for summary judgment that the Defendant did not produce during discovery.  Unlike the co-worker documents, the Defendant was required to produce these documents as part of their initial disclosure obligation under Rule 26(a)(1)(A)(ii).  The Court therefore has not considered any of these documents—which were attached to the declarations of Bonnie Gardiner and Graham Mafela—in making the instant ruling.  The Plaintiff also objects to Exhibit N to the Defendant's Reply Brief because it was not produced until after the close of discovery; the Court need not address this objection because it has not considered Exhibit N in making its ruling.

### III.  <u>FACTUAL BACKGROUND</u>

The background facts of record, viewed in the light most favorable to Plaintiff Patricia Kay Pruet, the non-moving party, are as follow.  Additional relevant facts are included in the Discussion section below.

**A.  Pruet's Job Duties**

Pruet began working as a lab technician at Fayette Memorial Hospital, which is now known as Fayette Regional Health System ("Fayette"), in 1969 at the age of nineteen.  She remained an employee of Fayette for over forty years.  She was over sixty years old at the time of her termination.

The Fayette Lab ("the Lab") in which Pruet worked was, at all times relevant to this case, divided into six work areas:  chemistry, hematology, histology, microbiology, phlebotomy, and front office.  Because there is overlap between the functions of the chemistry and hematology areas, it is common for employees to perform tasks in both areas.  The Lab is open 24 hours a day, with approximately twelve employees working the day shift, four working the evening shift, and two working the night shift.  All Lab employees are supervised by the Chief Tech of the Lab.

Beginning in the 1970s and continuing until her termination, Pruet worked primarily in the chemistry area of the Lab.  Pruet performed various tests such as chemistry analysis, blood gases, and urinalysis.  Pruet also was responsible for taking care of the Lab's "send-outs," which are tests that have been ordered by physicians that the Lab cannot perform on-site and thus have to be "sent out" to another lab to be run.

In January 2011, the Lab changed the reference lab it used for outside testing.  Because the new reference lab ("South Bend") was not interfaced with the Lab's computer system like the previous reference lab had been, a new system for handling "send-out reports"—that is, the test results received from the reference lab—had to be developed.  Under the new system, lab results from South Bend printed out on a dedicated printer in the Lab early each morning.  Pruet was responsible for taking the hard copy reports from the printer, labeling them with a sticker containing the patient's identifying information, and inputting the results into the patient's

computer record using the Lab's computer system.  Some tests were not yet coded into the Lab's

computer system, however.  For those "miscellaneous reports," Pruet could not input the actual

test results into the patient's computer record.   Instead, she was required to pull up the patient's

record and type "refer to printed report" in the comment section.  She was then required to

deliver the results to the ordering physician, either by fax or by placing a copy of the results in

the physician's mailbox in the Lab.   Pruet then gave a copy of the report to Chief Tech Shawna

Cerqua, who was responsible for putting the results into the Lab's computer system.[1]

### B.  Pruet's Job Performance History

Pruet's performance evaluations from 2006-2010 were generally positive.  The

evaluations provided for numerical ratings of 1, 2, or 3 in various categories, with 1 signifying

"needs improvement," 2 signifying "effective," and 3 signifying "outstanding."  Given the

weighting system used, the maximum possible total score was 2.73; in the years in question,

Pruet received total scores of 2.24, 2.27, 2.12, 2.27, and 2.26.  Her scores in the "Position-

Specific Criteria" category—the performance of her job—were consistently high.  The problems

noted in her evaluations included tardiness, working beyond her assigned hours, and difficulty

getting along with her co-workers, although this last problem was noted as improving over the

years.

Beginning in 1987, Pruet's supervisor was Chief Tech Bonnie Gardiner.  Starting in

2006, Gardiner began to notice problems with Pruet's performance.  These included, but were

not limited to, errors by both commission and omission on quality control duties required to be

---

[1]When a miscellaneous report came in, Cerqua would have to update the Lab's computer
system so that it had a code for the type of test in question.  Once that code was programmed by
Cerqua, Pruet and the other lab techs were able to input that type of test result into the computer
themselves; in other words, reports of that type of results would no longer be "miscellaneous
reports."

conducted to maintain Lab certification; misrepresentations by Pruet to Gardiner about having performed work that she had not performed; removal from the Lab of reference materials needed by other Lab employees; and working past her scheduled hours, both off the clock and without authorized overtime, both of which constituted Lab policy violations.

In 2007, Gardiner wrote the following on Pruet's evaluation form:

> I am deferring signing off on Kay Pruet's Performance Criteria to Dr. Tolnay.  I have had situations this year that bring into question Kay's ability to follow instructions (i.e. FRHS & Lab's P/P).  These have been documented and forwarded to [name illegible].  It is my opinion that the level of these occurrences has reached the point that they affect patient care and should be addressed by TL.  Such conduct affects TM's competency status.[2]

Dkt. No. 38-4.  As a result of Gardiner's serious concerns about her performance, Pruet's job duties were adjusted so that she functioned more in a Lab support staff capacity, thereby minimizing the amount of time she spent performing testing.  Pruet's quality control responsibilities were also removed due to Gardiner's concerns about potential adverse consequences to the Lab's accreditation.  Just prior to her resignation in 2008, Gardiner developed an objective competency assessment for Lab employees; based on that assessment, Pruet was not competent to perform testing in the Lab in any capacity.

Following Gardiner's resignation, Graham Mafela became Chief Tech and, therefore, Pruet's supervisor.[3]  Mafela also had problems with Pruet being tardy—rarely coming to work

---

[2] The Court notes this because Pruet asserts as an undisputed fact that "[t]o the extent her supervisors were critical of her performance, they occasionally noted that she was tardy too frequently and that she worked over to complete her duties."  Pruet Response at 7.  That assertion ignores this statement by Gardiner, one of Pruet's supervisors.  It is also a mischaracterization of the evidence, in that Pruet's issues with tardiness and working over her scheduled hours were not just mentioned "occasionally"; the latter was noted in 2007, 2008, 2009, and 2010, and the former was noted in all five of the performance reviews in the record.

[3] Pruet does not dispute the truth of these facts regarding her performance under Gardiner and Mafela, but argues that they are irrelevant because they relate to events that occurred many years prior to her termination.  The Court disagrees.  As noted below, decision maker Rhonda

on time—and working past her scheduled shift.  He also felt that she had a negative attitude and was difficult to work with.  She also was territorial, a trait that resulted in lower productivity and lack of teamwork.  Pruet would at times repeat work done by others, including Mafela himself, because she felt the need to handle certain tasks herself.  She also complained about other Lab employees using or searching for Lab materials that should have been available to all and which Pruet kept in places that she (incorrectly) viewed as her personal space.  Mafela also viewed as problematic the fact that Pruet was only trained in chemistry, while all other Lab employees were trained in both chemistry and hematology.  This meant that Pruet could not cover the hematology department for other employees during lunch and other breaks and could only work first shift, because there were too few employees on the other shifts to accommodate Pruet's limitation to chemistry.  Mafela offered Pruet the opportunity to acquire the necessary training to work in hematology, but she refused.[4]  At one point in time, when the Lab needed to reduce its operating costs, Mafela suggested to Fayette's Vice President of Human Resources Rhonda McPherson and CEO Randy White that Pruet's employment be terminated due to her many performance issues and limited skill set.  That recommendation was not followed.

Following Mafela's resignation in January 2010, Pat Lindsay served as Chief Tech.  Shawna Cerqua replaced Lindsay when she retired in May 2010, and remained the Chief Tech through Pruet's termination.  Cerqua was thirty years old when she became Chief Tech.

---

McPherson asserts that the fact that Pruet had long-standing issues with her job performance, including tardiness issues and working beyond her scheduled time, played into her decision that termination was warranted.

[4]Both Gardiner and Mafela state in their declarations that they believed Pruet was the poorest performing employee in the Lab, statements that Pruet says she is unfairly prevented from rebutting because of Fayette's refusal to produce the co-worker documents.  Because Pruet's performance relative to her co-workers was not relevant to the decision to terminate her, those statements are not material to the instant motion.

## C.  Cerqua's Discipline of Pruet

Fayette utilizes a progressive discipline policy.  The first disciplinary step is
"counseling"; continuing issues lead to the following disciplinary actions:  verbal warning;
written warning with a possible three-day suspension without pay; and, finally, termination.  The
disciplinary policy also provides that "[m]ore serious offenses may result in suspension/
immediate termination and are not subject to this three step process."  Dkt. 31-1 at 9.  With
regard to tardiness, Fayette's policy provides for a verbal warning on the fourth occurrence
within a rolling year, a written warning with suspension on the fifth occurrence, and termination
on the sixth occurrence.  The policy provides that tardiness violations "may be used in
combination with other violations of FRHS policy for disciplinary action."  *Id.* at 7.

When Cerqua first became Chief Tech, she was "extremely lenient" with regard to
tardiness.[5]  However, she eventually reached a point where she became stricter at enforcing the
tardiness policy, because tardiness had become a widespread problem in the Lab.[6]  Even then,
Cerqua did not follow Fayette's policy regarding tardiness to the letter; rather, she was more
lenient, permitting more incidents of tardiness to occur before disciplining an employee and
ignoring altogether incidents when an employee was only tardy by eight or nine minutes.[7]

Prior to Cerqua becoming her supervisor, Pruet had received occasional counseling over
her many years at Fayette, but she had not received any formal discipline.  That changed on

---

[5]Cerqua testified that she "was being extremely lenient with everyone because I was
being extremely lenient with Kay [Pruet].  So it was coming to my attention that, 'Well, if Kay
can do it, why can't I?'  So I was extremely lenient with everyone at this point in time for that
reason."  Cerqua Dep. at 91.

[6]Apparently all of the employees of the Lab had trouble getting to work on time, as
Cerqua testified that all of them were counseled by her about tardiness.

[7]Like her predecessors, Cerqua gave employees a six-minute grace period, so an
employee was not considered tardy unless he or she arrived more than six minutes late.

February 22, 2011, when she received a warning from Cerqua for being tardy[8] on December 29,

(89 minutes), January 18 (68 minutes), and February 10 (44 minutes).  After Pruet was late again

on February 16 (73 minutes), February 21 (21 minutes) and February 25 (31 minutes), Cerqua

issued her a written warning and a three-day suspension. At some point during this time period,

Cerqua asked Pruet if she would like to adjust her start time to arrive later in the mornings, but

Pruet declined, saying she preferred to end work earlier in the afternoon.  Following her

suspension, Pruet was not tardy again; however, she did call in and take unscheduled days off on

March 16, March 30, and April 12.  By memo dated April 25, 2011, Cerqua reminded Pruet that,

pursuant to Fayette's attendance policy, any additional unplanned absences would result in

disciplinary action.

### D.  Events Leading to the Termination of Pruet's Employment

On Monday, April 25 and Tuesday, April 26, 2011,[9] Pruet noticed that when she arrived

for work there were no reports on the printer from South Bend.  Pruet checked the pending report

and determined that Cerqua had inserted "refer to printed report" in the records of those patients

whose test results had been received.  In other words, Cerqua had performed what was normally

Pruet's responsibility with regard to the send-out results on those days.

---

[8]Cerqua had counseled Pruet regarding her tardiness and working over her assigned hours without authorization on November 30, 2010.  She was again counseled by Cerqua on December 13, 2010, for being late on December 3, 6, and 13.

[9]Pruet's testimony as to when this occurred varies.  In her deposition she states that it occurred on a Monday and a Tuesday in April, Pruet Dep. at 85, line 10, then she states it was "toward the end of April, and the first of May," *id.* at lines 14-15, then she says it was the "first of May, that's when I starting—the first of May I noticed I didn't have as many reports as I should have. . . .  And it was in May—because I kind of let it go at first."  *Id.* at 85, lines 15-17, 86 lines 1-2. A bit later she again says it was the end of April.  *Id.* at 89, line 5.  In her declaration, which was prepared after her deposition, Pruet states that it occurred on April 25 and 26. Cerqua states in her declaration that she processed the send-out reports herself on Monday May 2 and Tuesday May 3, which is consistent with some of Pruet's testimony, but inconsistent with Pruet's declaration.

On April 29, 2011, Cerqua met with Connersville physician Dr. Jag Patel.  Dr. Patel expressed his dissatisfaction with the decision to change reference labs.  Cerqua filled out a "Patient-Family-Customer Compliment/Complaint Form" relating to her meeting with Dr. Patel on April 29, 2011.  She described Dr. Patel's complaint as follows:  "Dr. Patel stated he is not receiving his send-out reports in a timely manner and that [the] lab is not following up with send-outs. He also said that some of his tests are not being sent out. He is not happy with the reference lab." On the "Investigation Information" section of the form, Cerqua wrote:  "Pulled 'pending report' and checked status.  Several results left on report from first of April."  Finally, in the "Results of Findings and Action Taken section, she wrote:

> Any report ordered as "misc." is to be faxed to physician.  When the test is ordered in CPSI, it can be charged. Once test ordered, "see South Bend printed report" is put in and test is completed.  Several pending from April w/ no attempt to result as above by send out tech.  Further investigation—these were on my desk mixed w/ the charges.[10]

Dkt. No. 38-10.  Also on April 29, 2011, Cerqua prepared a typewritten report regarding Dr. Patel's complaint, which read as follows:

> I received a phone call from Alison on 4-29-2011 regarding a complaint made by Dr. Jag. He stated that the Lab was not following through on his send out tests, and that the tests he ordered were not being sent out when they are received.
>
> I stated I was aware of one specimen: A Protein electrophoresis on Thursday 4/21 was received, but the label was not with the specimen. The tech put the specimen in the extra rack. Dr Jag's office called on Monday to find out about results and was informed that it had not been sent out. We located the tube and sent the specimen out on Monday afternoon. After this event, I notified techs in the send

---

[10]Pruet makes much of the fact that some of the undistributed reports were found on Cerqua's desk.  This is curious, inasmuch as Pruet's own testimony made it clear that she was to provide a copy of each miscellaneous report to Cerqua so that Cerqua could program the codes into the computer; however, the actual reporting of the results to the ordering physician was to be done by Pruet by placing another copy of the report in the physician's mailbox.  In other words, copies of miscellaneous reports were supposed to end up on Cerqua's desk, and the mere fact that a copy of a given report was on Cerqua's desk would not have indicated to Cerqua that the report had not been forwarded to the ordering physician.

out area that they are to print a pending immediately prior to packaging the send outs and ensure that each test that was received on that date is in the rack for shipment. (Kay informed Stacey that she did not need to do this as it is a "waste of time" and "stupid."[11])

During my monthly POL [physician office lab] inspection, I stopped by Dr Jag's office. He informed me that he is extremely unhappy with the new reference lab. He is not receiving results and his tests are not being sent out. He questioned why he was not consulted about the change, and why the change was made. Was it just to save money? He also wanted to know who chose the reference lab.

I explained to him that I had spoke[n] with several area Lab Managers and the majority of labs our size in this area utilize South Bend. I reminded him of the letter sent out by Dr. Tolnay and myself explaining the reference lab change, and asking for any questions/concerns to be addressed to either of us. I also explained that our goal is to have everything reference related consolidated to one reference lab. I told him I was aware of the issue with the Protein Electrophoresis, and how I had solved that issue. In addition, I explained the entire process of sending our tests, including the lack of interface currently, and how the results are put out. I then also explained how it will be handled when the interface is up and running. In the middle of my explanation, he interrupted me and asked me how I get along with Kay Pruet. I said fine, to which he laughed. He then asked me why so many changes were being made, to which I asked him to be more specific. The only thing he said was the reference lab, and that he had patient with a high INR [lab result] who was not on Coumadin, and the next day when he received another INR [lab result] result it was low. I asked for the patient's name so I could investigate, and he said he did not know the patient's name. He asked me why we did not go with the Mayo Clinic since that is who Reid [Hospital] uses. I explained again how we reached the decision to go with South Bend, and that Mayo [C]linic was not one of the labs we had looked at. I informed him that Dr. Tolnay would have had input into the Mayo [C]linic decision if we had looked at that, to which he replied that Dr Tolnay did not know anything about it, because he just looks at slides.

At this point, I apologized for the issues he has been having with the Laboratory, and I promised to work on the situation. I also notified him that I had spoken with CPSI [company that provided the lab information system] on Thursday and that Roy Cupp [IT Director] and I were meeting on Monday to ensure the reference lab interface is up and running ASAP. I asked him to please call ME DIRECTLY with any further issues regarding the lab.

Dkt. No. 38-11.

---

[11]Pruet denies making this statement.

The following day, which was a Saturday, Cerqua went to the lab and ran a report of pending send-out lab tests.  Cerqua determined that there were numerous send-out reports that had not been communicated to the ordering physician; in other words, "see printed report" had not been entered into the computer and no hard copy of the results had been provided to the physician, so the tests were still listed as "pending," as if the results had not been received from the reference lab.  Cerqua highlighted and annotated the list of pending send-out tests and used it to input and report the results herself.[12]  She found some of the undistributed reports in Pruet's work area; the remainder she had to print out from the computer.  She did not share the pending list that she highlighted with Pruet; if she had, Pruet "may have been able to use that report to identify the individual responsible" for the failure to handle the send-out results properly.  Pruet Declaration at ¶ 20.[13]  Pruet was absent from work on April 5, 6, 7, 8, and 12, and she did not work weekends.  She was not responsible for handling the send-out reports that were received on days she was not working; therefore, the mishandled send-out results could have been the fault of an employee who filled in during Pruet's absences or an employee who worked weekends.

On May 4, 2011, Cerqua, who had not informed Pruet that there was any problem with the handling of send-out results, asked Pruet to fax all of Dr. Patel's reports to him. Pruet was already faxing to Dr. Patel all abnormal test results, partial reports and miscellaneous reports; based on Cerqua's request, she began faxing any send-out report received for any test requested by Dr. Patel.

---

[12]This highlighted and annotated list apparently was not retained and has not been produced by Fayette.

[13]In her declaration, Pruet states that she "properly handled the paperwork for every send out report to which [she] had access," that "[e]ach morning that [she] worked, [she] properly processed each of the send out reports that had been transmitted to [Fayette] during the previous night," and "throughout the day, [she] properly processed each of the send out reports that was transmitted to [Fayette] during the course of the day."  In other words, Pruet denies that she made any mistakes in completing her send-out duties.

### D.  The Decision to Terminate Pruet's Employment

Cerqua reported her conclusion that Pruet had failed to properly handle numerous send-out results to her supervisor, Alison Gates, who in turn reported the issue to Rhonda McPherson, Fayette's Vice President of Human Resources.  McPherson was not provided with the annotated and highlighted pending report prepared by Cerqua.

McPherson had the ultimate responsibility for hiring, firing, and disciplining Fayette employees.  McPherson was aware that Pruet's past supervisors, Gardiner and Mafela, had noted problems with Pruet's performance; specifically excessive tardiness, working over her scheduled time, working unauthorized overtime, and segregating documents that should have been readily available to all Lab employees.  In fact, Mafela had even recommended that Pruet be terminated at one point, but McPherson was reluctant to terminate Pruet given her long tenure at the Lab and had not acted on Mafela's recommendation.  However, given Pruet's "prolonged and ongoing performance and attendance issues," coupled with Cerqua's report regarding her investigation into Dr. Patel's complaint, which McPherson determined demonstrated a "failure to timely complete her primary job duties," McPherson decided termination was warranted.  Accordingly, McPherson decided to ask for Pruet's resignation, and if that was not forthcoming, to terminate her employment.  McPherson met with Pruet at the end of her shift on May 6, 2011, explained to her the two options, and refused to allow Pruet to call an attorney.  Pruet chose to resign, the option that permitted her to be paid the balance of her earned time off and entitled her to $1500 severance pay.  Along with her signature, Pruet wrote:  "Was not allowed to make any phone call.  Was not my decision to do this."

# IV. <u>DISCUSSION</u>

Pruet alleges that she was terminated because of her age in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*.  Pruet has chosen to

respond to Fayette's motion for summary judgment using the direct method and circumstantial

evidence.  To survive summary judgment on her ADEA claim, Pruet thus must

> offer evidence from which an inference of discriminatory intent can be drawn,
> such as: (1) suspicious timing; (2) ambiguous statements or behavior towards
> other employees in the protected group; (3) evidence, statistical or otherwise, that
> similarly situated employees outside of the protected group systematically
> receive[d] better treatment; and (4) evidence that the employer offered a
> pretextual reason for an adverse employment action.

*Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659-60 (7th Cir. 2013) (citation and

internal quotation marks omitted).  "[T]he circumstantial evidence must be strong enough, taken

as a whole, to allow the trier of fact to draw the necessary inference"; that is, "[i]f the plaintiff

can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to

conclude that it is more likely than not that discrimination lay behind the adverse action, then

summary judgment for the defendant is not appropriate, and the plaintiff may prevail at trial even

without producing any 'direct' proof."  *Morgan v. SVT, LCC,* ___ F.3d ___, 2013 WL 3944269

(7th Cir. 2013).

There is an additional wrinkle in this case, in that the evidence is undisputed that

McPherson was the person who made the decision to terminate Pruet's employment, but Pruet

does not allege that McPherson—who is very close in age to Pruet—had any age-based bias.

Rather, she asserts that Cerqua did, and that McPherson based her decision entirely on false

information provided to her by Cerqua for the purpose of orchestrating Pruet's termination

because she did not like supervising someone as old as Pruet.  Thus, Pruet argues that, under the

"cat's paw" theory, Cerqua's discriminatory animus may be imputed to McPherson.  *See, e.g.,*

15

*Lindsey v. Walgreen Co.*, 615 F.3d 873, 875 (7th Cir. 2010) ("The term 'cat's paw' refers to an unbiased decisionmaker who is being used as a tool by a biased employee.").  The Court agrees that there is sufficient evidence in the record for a reasonable jury to apply the cat's paw theory in this case.

What this means, however, is that Pruet's case depends upon her ability to prove that Cerqua knowingly provided false information to McPherson, and that she did so because of her age-based bias.  To that end, Pruet makes several factual assertions.

First, Pruet asserts that her past performance issues were not considered by McPherson in deciding to terminate her employment; in other words, she asserts that her termination was based solely on the information provided by Cerqua. To support this assertion, Pruet points to (1) her past performance evaluations and pay raises; and (2) the fact that McPherson was aware of the alleged performance deficiencies prior to Cerqua assuming the role of Chief Tech but did not deem them sufficient to warrant termination.[14]  With regard to the former, while Pruet's performance evaluations can be characterized as generally positive, they also consistently reflect the on-going issues of tardiness and working over her scheduled time, and Gardiner's note on her 2007 evaluation reflects problems with her substantive work performance as well.  Thus, her performance evaluations support, rather than contradict, McPherson's, Gardiner's, and Mafela's testimony that Pruet had had on-going issues for several years before Cerqua became her supervisor.

---

[14]Pruet also notes, correctly, that she was not terminated pursuant to the tardiness policy; she reached step two of the three-step progressive discipline policy for tardiness and then was not tardy again prior to her termination.  Fayette has never asserted that Pruet was terminated for tardiness; rather, it asserts that her tardiness problem was considered in making the decision to terminate her.  There is nothing improper about that, especially in light of the fact that the policy expressly provides that tardiness violations "may be used in combination with other violations of FRHS policy for disciplinary action."

With regard to the latter, McPherson does say in her declaration that, in light of Pruet's long tenure at the Lab, she was reluctant to discharge her despite the performance issues reported to her by Gardiner and Mafela and Mafela's recommendation that she be terminated.  However, her declaration also makes it clear that she considered these "prolonged and ongoing performance and attendance issues" when she ultimately decided that termination was warranted. McPherson Dec. at ¶ 15.  There is nothing inconsistent, improper, or suspicious about this.  An employee with a lengthy, stellar record can do one thing that is a serious enough infraction to warrant termination.  On the other hand, an employee whose record is not stellar, but whose infractions are not, when each is considered in isolation, serious enough to warrant termination, may finally reach a critical mass of infractions such that termination is warranted.  Fayette's discipline policy, like that of most employers, recognizes that fact by providing for progressive discipline for most infractions but suspension or immediate termination for "more serious offenses."  McPherson states in her declaration that "My decision to end [Pruet's] employment . . . was a difficult one given her years of employment.  However, it was based solely upon [her] sustained unwillingness or inability to meet the performance expectations for the position she held in the lab, as described herein."  McPherson Dec. at ¶ 20, Dkt. 31-1 at 5.

Pruet next takes aim at what Fayette has characterized as the final straw that led to Pruet's termination—the complaint by Dr. Patel—arguing that "[i]n light of all of the evidence presented there are many different conclusions that a reasonable jury could reach from the evidence submitted."  Pruet Response at 26.  First, she argues, the jury could conclude that Cerqua fabricated the complaint from whole cloth because Fayette "has not provided any complaint form completed by Dr. Patel, any notes from Dr. Patel, or any statement from Dr. Patel regarding a complaint"; rather, the only evidence that the complaint was made is the

testimony of Cerqua and documents created by her.  Thus, Pruet argues, "[a] reasonable jury could find it suspicious that all of the evidence regarding the alleged Dr. Patel complaint comes from Cerqua, rather than from Dr. Patel and conclude that the alleged complaint was simply fabricated in order to find a way to get rid of an older worker." *Id.* at 26-27.

There are several problems with this argument.  First, there is nothing facially suspicious about the fact that Cerqua did not ask Dr. Patel to fill out a written complaint form.  Her testimony is that Dr. Patel stopped her when she was at his office (outside of the hospital) for other business and that he relayed his concerns about the new reference lab and his delayed lab results there.  Not surprisingly, Cerqua did not require Dr. Patel to do more in order to have his concerns addressed; rather, she utilized Fayette's "Patient-Family-Customer Compliment/ Complaint Form" to memorialize the conversation herself.  It is simply good customer service to address a problem in a way that requires minimal effort on the part of the aggrieved customer.[15]

Of course, it is possible that the jury could find Cerqua's testimony not credible, even though it is not inherently so.  However, "a party cannot defeat summary judgment with resort to attacks on credibility alone." *Morgan*, 2013 WL 3944269; *see also Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (cited in *Morgan*) ("[W]hen challenges to witness' [sic] credibility are all that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper.").  In other words, in the absence of evidence that shows a witness's testimony is false, speculation that the witness is lying cannot be used to defeat summary judgment.  *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) ("Lacking such evidence, Argyropoulos's argument rests on speculation that

---

[15]The Court notes that it is Pruet's burden to prove pretext; Fayette does not have to disprove it.  *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 826 (7th Cir. 2006) ("Moreover, in arguing that a lack of documentation supports a finding of pretext, the plaintiffs confuse [the defendant's] burden with their own burden.").

the City's employees lied to conceal their true motives. Such speculation will not withstand summary judgment."); *Springer*, 518 F.3d at 484 ("'It is well-settled that speculation may not be used to manufacture a genuine issue of fact.'") (quoting *Amadio v. Ford Motor Co*., 238 F.3d 919, 927 (7th Cir. 2001) and citing *Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) ("The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. . . . Speculation will not suffice.")).  Such speculation is all Pruet advances here when she suggests that Dr. Patel did not make a complaint to Cerqua.

Pruet similarly speculates about the content of Dr. Patel's complaint, arguing that the jury could find that he made a complaint but Cerqua mischaracterized it in her report.  Again, there is no evidence to support such a conclusion, other than the possibility that Cerqua is lying, which is not sufficient to defeat summary judgment.

Finally, Pruet suggests that Dr. Patel did complain, and that the problems about which he complained were caused either by Cerqua or by another employee who failed to handle the send-out results properly in Pruet's absence.  As evidence of this fact, Pruet cites her own declaration, in which she states the following:

> Throughout 2011, I properly handled the paperwork for every send out report to which I had access.  I performed my work in April, 2011 with the same care I used throughout 2011 and before.  I did not work April 5th through April 8th because I was visiting my sister in Ohio [who] was terminally ill and who passed away shortly after I was terminated.  I also took a vacation day on April 12, and I did not work any weekends.  So I was not responsible for handling any send out reports that were received by Fayette Regional on those days.  On the days that I did work, I followed appropriate procedures and properly handled every send out report that Fayette Regional received.  Send out reports from the South Bend lab are transmitted to the Fayette Regional printer during the night so the paper copies are in the printer tray at the beginning of first shift and then one or more times each day.  Each morning that I worked, I properly processed each of the send out reports that had been transmitted to Fayette Regional during the previous night.  And throughout the day, I properly processed each of the send out reports that was transmitted to Fayette Regional during the course of the day.  For those reports for test results that the Fayette Regional computer system could accept, I

> pulled up the patient record on the Fayette computer system and input the test results.  For the Miscellaneous Reports, I pulled up the patient record and inserted "refer to printed report" in the comments section.  I then made copies of each report and distributed the copies by fax and/or delivery to the hospital mail box of the requesting physician, to medical records, and retention by the lab.  During each work day, I printed what is called the "pending report" several times including before packaging the send outs for delivery to the outside lab and also to check the status of send out tests for which results had not been reported.

Pruet Dec. at ¶ 16, Dkt. 38-4.

As Pruet correctly notes, the Seventh Circuit has held that when an employee provides "a detailed refutation of events which underlie the employer's negative performance assessment," the employee demonstrates "that the employer may not have honestly relied on the identified deficiencies in making its decision." Pruet Response at 24 (quoting *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001) (in turn quoting *Day v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460-61 (7th Cir. 1994)).  However, Pruet's declaration does not provide the requisite "detailed refutation of events."  Rather, Pruet essentially asserts that she did not make any mistakes in handling send-out reports in April 2011.  The Court does not doubt the sincerity of Pruet's belief in that statement; however, the very nature of such mistakes makes it impossible for Pruet to know for certain that she did not make any.

Even if Pruet's belief that she correctly processed all send-out reports for which she was responsible was considered evidence, the evidence would only support a finding that Cerqua was incorrect in her conclusion that Pruet was responsible for the problem reported by Dr. Patel, not that Cerqua was dishonest in reporting her conclusion to McPherson.  However, "[a]n inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Hill v. Tangherlini*, ____ F.3d ____, 2013 WL 3942935 at *2 (7th Cir. 2013) (citations omitted).  In other words,

> [p]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is lie, specifically a phony reason for some action. Thus, in assessing a plaintiff's claim that an employer's explanation is pretextual, we do not sit as a "super personnel review board" that second-guesses an employer's facially legitimate business decisions. Rather, we ask only whether the employer's explanation was "honestly believed."

*Argyropoulos*, 539 F.3d at 736 (citations and internal quotation marks omitted); *see also Teruggi*, 709 F.3d at 661 (quoting *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010) ("An unwise employment decision does not automatically rise to the level of pretext; rather, a party establishes pretext with evidence that the employer's stated reason or the employment decision 'was a lie—not just an error, oddity, or oversight.'")).

Finally, even if the Court were to assume that Cerqua's report to McPherson was a lie, and that there were no missed send-out reports, or perhaps that Cerqua knew that the missing reports occurred on days Pruet was not responsible for them but blamed Pruet anyway,[16] the evidence of record still would not be sufficient for Pruet to survive summary judgment.  A plaintiff proceeding under the direct method, as Pruet is, must do more than point to evidence from which a reasonable jury may conclude that the defendant's stated reason for the adverse employment action at issue is pretextual; she must produce evidence that points directly to discrimination as the actual reason.  *Hitchcock v. Angel Corps, Inc.,* 718 F.3d 733, 740 (7th Cir. 2013) ("Of course, a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus."); *Van Antwerp*, 627 F.3d at 298-99 ("We also note that, assuming Van Antwerp marshaled enough circumstantial evidence to show pretext, his claim of discrimination under the direct method would still fail. Evidence offered under the direct method 'must allow a jury to infer more than pretext; it must itself show that the

---

[16]In addition to the days she was absent from work, Pruet points to the two days that Cerqua took the send-out reports from the printer and processed them herself.

decisionmaker acted because of the prohibited animus.'") (quoting *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003) and citing *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("[C]ircumstantial evidence . . . must point directly to a discriminatory reason for the employer's action. Otherwise, the plaintiff must proceed by way of the well-known indirect route.")); *see also Hester v. Indiana State Dept. of Health*, ___ F.3d ___, 2013 WL 4034397 (7th Cir. 2013) (even if employer fabricated a stated reason for termination, "nothing in this account points to discrimination as the real reason for the Department's action. Gentry and other supervisors may have treated Hester poorly out of personal animosity. That might violate the state's law prohibiting merit employees from being terminated without 'just cause,' but it does not leave gender or race as the only alternative explanation."); *Teruggi*, 709 F.3d at 661 ("Even if Teruggi's evidence showed pretext, that alone would not be sufficient to survive summary judgment under the direct method.").[17]

Pruet makes several allegations that she asserts are facts that would support an inference that Cerqua orchestrated her termination because of anti-age animus. First, she asserts that younger workers were treated more favorably by Cerqua. To that end, she points to the fact that

---

[17]Pruet, quoting *Gordon*, 246 F.3d at 889, argues that "'if the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses'" and "'[i]n such circumstances, the employee creates 'a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination.'" Pruet Response at 24. In *Gordon*, however, the plaintiff was proceeding under the indirect method, and the Supreme Court has held that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, *together with the elements of the prima facie case [required by the indirect method]*, suffice to show intentional discrimination." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis added); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). Here Pruet is proceeding under the direct method, however, and has not attempted to satisfy the prima facie case; therefore, she must have something more than just evidence of pretext—some circumstantial evidence that points directly to age discrimination—in order to survive summary judgment.

her younger co-worker, Casey Branum, "was habitually late to work, but did not receive any discipline." Pruet Response at 30. Actually, Branum was given a verbal warning for being tardy on February 10 (27 minutes), February 22 (13 minutes), and February 25 (19 minutes). The evidence cited by Pruet shows that Branum also was tardy as follows: March 11, 2011 (8 minutes); March 18 (9 minutes); March 31 (8 minutes); April 14 (8 minutes); April 20 (25 minutes); April 25 (9 minutes); and April 26 (8 minutes). Branum did not receive a suspension for these additional incidents of tardiness. Pruet's records indicate that she received a verbal warning for being late on December 29 (89 minutes), January 18 (68 minutes), and February 10 (44 minutes). Pruet received a written warning and three-day suspension for being late on February 16 (73 minutes), February 21 (21 minutes) and February 25 (31 minutes). The tardies that were the bases for Pruet's warnings were not her only tardies, however. Her records indicate that she was also tardy on the following dates during the relevant time period: January 5 (14 minutes); January 13 (7 minutes); January 17 (9 minutes); January 19 (15 minutes); January 20 (8 minutes); January 21 (8 minutes); January 27 (39 minutes); January 28 (18 minutes); February 1 (48 minutes); February 2 (115 minutes); February 4 (20 minutes); and February 11 (12 minutes).[18] It appears from the evidence of record[19] that Pruet was tardy both more frequently and more egregiously than Branum; the fact that she received a suspension while Branum did not is neither suspicious nor surprising.

---

[18]The Court realizes that this "analysis" of Pruet's and Branum's time records—simply comparing their clock-in time with the time they were supposed to report to work—fails to account for any days that they may have had excused tardies—due to weather, perhaps, or a doctor's appointment. This is the method used by Pruet to determine that Branum was tardy, however, so the Court has applied it to Pruet's records.

[19]Branum's complete time records are not in the record, of course; what is in the record at a minimum demonstrates that neither Pruet nor Branum were disciplined in strict accordance with Fayette's tardiness policy and each had tardies that did not result in discipline.

Next, Pruet argues that her younger co-worker Danika Lynch was treated more favorably than she.  Specifically, Pruet asserts that Lynch falsified test results—an offense worse than failing to report test results—and was not fired for it.  Pruet's only evidence regarding this alleged malfeasance by Lynch is Pruet's own deposition testimony:

> A:  Well, she [Lynch] got away with making up answers. . . .  Her supervisor knew it. [Cerqua] knew it.  And Dr. [Tolnay] knew it.  And not a thing was done. . . .
>
> Q:  All right.  So you contend that she was permitted to make up lab reports and, therefore, she was treated more – and was not terminated and, therefore, she was treated more favorably than you?
>
> A:  Well, I would say permitted is not the right word.  I mean you just don't do that.
>
> Q:  What's the right word?
>
> A:  But it slid by.  I meant they didn't do anything.
>
> Q:  What lab results was she making up?
>
> A:  BACT.
>
> Q:  Now, how would you have access to this kind of information?
>
> A:  The girl who works in BACT said it.
>
> Q:  Okay. So this was just a rumor that you had heard?
>
> A:  No, it was more than a rumor.
>
> Q:  Who told you that she had been making up her results?  I mean you—are you suggesting she was putting together like results that she hadn't actually run?  She was supposed to run the test, and then give the result, and you're saying she was just giving a result, and making something up, and not running the test?
>
> A:  Correct.
>
> Q:  Who told you that?

A:      Karen [McCain], the gal who always checked [Lynch's] work in BACT. . .
        .

Q:      So at what point in time did Miss McCain tell you that Danika Lynch was
        fabricating test results?

A:      I think she told me – and the reason probably, I – told me because Karen
        could not believe it.  I mean techs just don't do that.  You can't do that.

Q:      My question is, when did she tell you this was happening?

A:      It was in—it was either the end of March, or the first of April [2011].
        Right around in there. . . .

Q:      Did you bring this to anyone's attention?

A:      No, I didn't, no.

Q:      Okay.  Then how do you know that Miss Cerqua allegedly knew this?

A:      Because Karen took it to her supervisor, which was Jennifer, and then they
        took it to Shawna [Cerqua]; Jennifer and Karen.

Q:      How do you know all this?

A:      Because you could see them.  [Cerqua's] office was right there, you know,
        in the—

Q:      So you overheard, or were a part—you either heard, or were a part of this
        discussion?

A:      I didn't hear it, and I wasn't a part of it.

Q:      Then how do you know—

A:      That's protocol.

Q:      Well, how do you know that's what they were discussing?

A:      Because Karen said she was going to take it to Jennifer.  That is protocol.
        You go to your supervisor first, and then the manager, and then a
        pathologist, which is Dr. [Tolnay].

Q:      So what you're saying is Karen said she was going to do this, and you're
        presuming that she did?

> A:    Oh, I know she did.  She wouldn't let things like that slide by.  That is her working area, and she is a stickler for correct results.  She wouldn't let that go under the rug.
>
> Q:    But my point is you don't have any personal knowledge.  You didn't hear the conversations.  You were not involved in any of these conversations?
>
> A:    Other than Karen telling me that's what she did.

Pruet Dep. at 191-95.  This, of course, it not evidence; it is merely a conclusion drawn by Pruet based on hearsay.  There is simply no evidence of record that Cerqua treated Lynch more favorably than Pruet.

Next, Pruet argues that the fact that she was asked to train Stacey James—a younger co-worker—in the months leading up to her termination demonstrates that Cerqua was planning to get rid of her at the first opportunity.  James did, in fact, take over the bulk of Pruet's job responsibilities after Pruet was terminated.  However, both Cerqua and Pruet testified that James was being trained as part of her path to obtain the education necessary to become a medical lab technician.  While Pruet first suggested in her deposition that she was asked to train James because two other (younger) co-workers wanted her to be able to work "in the back" of the Lab with them, because they, along with Cerqua, were "a clique," when pressed she testified as follows:

> Q:    So you believe that you being asked to train Miss James on the send outs is somehow evidence of age discrimination, because you think Casey, and Jennifer, were friends with her, and somehow—are you suggesting they influenced Miss Cerqua to get her back there so they could all be working together?  Is that what you think?
>
> A:    I would not say that.[20]  I know Stacey wanted to learn things, you know, because she was going to take that course, to be a –you know, become a lab technician.  So I would not say that—I mean she had to learn. . . .

---

[20]Pruet had, in fact, seemed to have just said that.  When asked how being asked to train James was evidence of age discrimination, Pruet testified:  "And, like I said, it goes back to Casey and Jennifer wanting Stacey in the back, to work, because—I mean everybody had a

Pruet Dep. at 61-62.  Cerqua likewise testified that Pruet was asked to train James as part of James's training to become certified as a medical lab technician and that she was trained in each department, not just by Pruet.  James worked in the Lab as a phlebotomist, for which she was paid, and then spent additional, unpaid time in the Lab training with Pruet and others, for which she received educational credit.[21]  Thus, Cerqua's and Pruet's testimony is consistent; both indicate that James was trained by Pruet as part of her education.  No reasonable jury could draw an inference of age discrimination based upon that fact.

Finally, as evidence that Cerqua was biased against older workers, Pruet argues that "shortly after assuming the role of Chief Tech, Shawna Cerqua terminated Joy Abernathy, the oldest employee in the lab at the time, in a purported reduction in force, and chose to retain Jill Smith, who was roughly half of Abernathy's age."  Pruet Response at 30-31.  Pruet does not point to any evidence that Cerqua was responsible for choosing to retain Smith instead of Abernathy.  In fact, there is none; rather, the evidence cited by Pruet is the following testimony by Cerqua:

> Q:    Do you remember ever having to discipline Joy Abernathy?
>
> A:    Yes.
>
> Q:    What did you have to discipline Joy Abernathy for?

---

certain area, you might as well say.  They wanted her in the back to work.  There was no room for her to work back there . . . They would relay that to Shawna, because they spent three-fourths of the day in Shawna's office, and somebody had to go.  Somebody had to go from the back, in order for Stacey to be in the back to work.  So it was a set up.  They set me up."  Pruet Dep. at 58-59.  If this version of Pruet's testimony is credited, it might suggest that Pruet was terminated because her co-workers wanted to work with Stacey, but there is no suggestion that it had anything to do with Cerqua being biased against Pruet because of her age.

[21]Cerqua testified that "it's part of your associate's [degree] program you have to do clinical hours.  And those clinical hours were done in our lab for several different colleges. Students would come in and do clinical hours and basically work in the lab as a student." Cerqua Dep. at 96.

A:     There were several complaints from staff about her professionalism and the way she was treating staff.  And it was more than one individual.  So I called her into my office and told her in the interim while everything got ironed out, I was going to take over scheduling for the front office and I would schedule for the whole lab.  And she told me to do whatever the F I want, and got up and slammed my door.

Q:     Did you fill out any disciplinary form because of this interaction with Joy Abernathy?

A:     I believe so, but I don't recall.  I reported it to Allison and Rhonda, I believe.

Q:     Do you know if Allison and Rhonda took any action as a result of this particular incident?

A:     I do know we were eliminating some positions in the lab due to budget cuts and because of—one of the positions she held was kind of a duplication—and to the attitude [sic.] and what had happened, that her position was eliminated from the lab.

Cerqua Dep. at 87-88.  This evidence would not support a finding that Cerqua made the decision to eliminate Abernathy's position; indeed, there is no evidence that Cerqua had the authority to make such a decision.

Even if the Court assumes that Cerqua lied about either the existence of Dr. Patel's complaint or her conclusion that Pruet was responsible for the problems about which he complained, Pruet has presented no evidence that points directly to age discrimination as a reason for Cerqua's actions.  In other words, Pruet has not presented sufficient "scraps of circumstantial evidence" from which a reasonable jury could conclude that she was terminated because of her age.  Accordingly, Fayette is entitled to summary judgment.

## V.  <u>CONCLUSION</u>

For the reasons set forth above, Fayette's motion for summary judgment is **GRANTED** in its entirety.

SO ORDERED:        9/17/13

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification